## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRESENIUS KABI USA, LLC
3 Corporate Drive
Lake Zurich, Illinois 60047

                Plaintiff,

    v.

UNITED STATES OF AMERICA,

STEPHANIE CARLTON
in her official capacity as Acting Administrator of the
Centers for Medicare and Medicaid Services,
Office of the Administrator
7500 Security Boulevard
Baltimore, MD  21244

CENTERS FOR MEDICARE AND MEDICAID
SERVICES,
7500 Security Boulevard
Baltimore, MD  21244

DOROTHY FINK,
in her official capacity as Acting Secretary of U.S.
Department of Health and Human Services
Office of the Secretary
200 Independence Avenue, SW
Washington, DC  20201

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES
200 Independence Avenue, SW
Washington, DC  20201

                Defendants.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fresenius Kabi USA, LLC ("Fresenius Kabi") brings this Complaint against the United

States of America, the Department of Health and Human Services ("HHS"), the Secretary of HHS

1

("Secretary"), the Centers for Medicare and Medicaid Services ("CMS"), and the Administrator of CMS (collectively, "Defendants") seeking declaratory and injunctive relief.

## INTRODUCTION

1.    This Complaint is about a very old injectable drug called heparin sodium ("heparin").  Discovered in 1916, heparin is a well-known anticoagulant and one of the oldest injectable medicines still in use today.  The first new drug application ("NDA") for heparin took effect at the end of the Great Depression in 1939, and the drug was originally marketed as Liquaemin®.  Since then, there have been many generic equivalents.  Fresenius Kabi's generic heparin is one of them.

2.    Injectable drugs are usually marketed in multiple formulations, and the heparin sold by Fresenius Kabi is no exception.  Fresenius Kabi thus has sold its heparin (1) in vials; (2) in a pre-filled syringe; and (3) in IV-bags of heparin premixed with standard intravenous fluids (*i.e.*, saline or dextrose).  But these are just different presentations of fundamentally the same drug. They are all solutions of the same active ingredient (heparin sodium) in the same dosage form (injection) for the same route of administration (intravenous) and the same intended use (prevention of blood clots).

3.    Fresenius Kabi's heparin formulations also are all generic, non-innovator drugs. Each is a duplicate of one or more heparin products previously marketed by one or more other companies pursuant to one or more applications previously approved by the U.S. Food and Drug Administration ("FDA").  Indeed, most were introduced as duplicates of heparin products that had been marketed by others for decades.

4.    CMS *mostly* accepts this reality.  In a series of four decisions between January 2021 and March 2024, CMS agreed that the prefilled heparin syringe and all of the heparin vials sold by Fresenius Kabi are generics and are properly classified as "noninnovator multiple source drugs"

for purposes of the Medicaid Drug Rebate Program ("MDRP").  CMS therefore confirmed, as common sense and the law both require, that Fresenius Kabi can pay Medicaid rebates for the vials and the syringe at the lower rate that applies to generic drugs.

5.      Nevertheless, in a fifth decision on September 30, 2024 ("Decision," attached as **Exhibit A**), CMS purported to classify four of the premixed heparin bags marketed by Fresenius Kabi as "innovator multiple source drugs."  CMS thereby purports to require Fresenius Kabi to pay Medicaid rebates for the premixed bags at the higher rate for pioneer drugs.

6.      CMS's decision is unsupportable.  Expressed pictorially, CMS has agreed that the following heparin products are all generic, non-innovator drugs:





But CMS insists that these heparin products are innovator drugs:

 

There is no factual basis for the line CMS has drawn. First, there is no clinical difference between heparin in a vial and heparin in a premixed bag. The only difference is a practical one: premixed bags save several admixture steps for hospital staff, thereby saving time and money, and—critically—reducing the risk of product contamination and medication error. Second, premixed bags are not new. Intravenous medicines have been marketed in premixed bags since the 1970s. Relevant here, in 1983 and 1984, FDA approved other companies' NDAs for premixed heparin bags in the same strength (25,000 units) and diluents (0.45% saline and 5% dextrose) as those pictured above.

7.    CMS's position is contrary to the MDRP statute and CMS regulations, and cannot be reconciled with its guidance or previous decisions, including its decisions regarding heparin.

8.    Fresenius Kabi therefore brings this lawsuit to compel CMS to (i) recognize that all of the heparin products marketed by Fresenius Kabi are properly classified as non-innovator multiple source drugs, and (ii) allow Fresenius Kabi to pay the lower rebate rate for non-innovator products for all of its heparin products.

## THE PARTIES

9.    Fresenius Kabi is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 3 Corporate Drive, Lake Zurich, Illinois. Fresenius Kabi is a global health care company that specializes in injectable medicines, biosimilars, and technologies for infusion, transfusion, and clinical nutrition.  The majority of its drug portfolio consists of non-innovator multiple source drugs (*i.e.*, generics), including the heparin products at issue in this case.

10.    Non-party Invenex Laboratories ("Invenex") was one of Fresenius Kabi's predecessors.  Invenex was the generic drug manufacturer that filed NDA 17029 for the heparin products at issue in 1971.  Through a series of transactions that are not relevant here, NDA 17029 came to be held by Fresenius Kabi in 2008.

11.    Defendant HHS is an executive department of the United States Government. HHS's headquarters are located at 200 Independence Ave., S.W., Washington, D.C.  20201.

12.    Defendant Dr. Dorothy A. Fink is named in her official capacity as Acting Secretary of HHS, in whom is vested the authority by statute to implement the requirements of the Social

Security Act, including the MDRP.[1]  Defendant Fink maintains her office at 200 Independence Ave., S.W., Washington, D.C. 20201.  She is being sued in her official capacity only.

13.    Defendant CMS is an agency of the United States Government within HHS.  Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244.

14.    Defendant Stephanie Carlton is named in her official capacity as Acting Administrator of CMS, to whom HHS has delegated authority to implement certain requirements of the Social Security Act, including the MDRP.  Defendant Carlton maintains her office at 7500 Security Boulevard, Baltimore, MD 21244.  She is being sued in her official capacity only.

## JURISDICTION AND VENUE

15.    Plaintiff Fresenius Kabi's action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, *et seq.*, and the Social Security Act.  *See* 42 U.S.C. § 1396r-8.

16.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 1361 (action to compel federal officer to perform his or her duty).

17.    The Court has authority to grant the relief requested by Fresenius Kabi pursuant to the APA, 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

18.    There exists between the parties an actual controversy, justiciable in nature, wherein Plaintiff seeks a declaration of its rights by this Court and injunctive relief.

---

[1] "The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."  5 U.S.C. § 702 (emphasis added).

19.     Venue is proper in this district under 28 U.S.C. § 1391(e) because one or more Defendants reside in this judicial district.

20.     The Decision is final agency action.  In its letter, CMS described its action as a "**Decision**" to "deny" Fresenius Kabi's "request to report the [heparin bags] to the Medicaid Drug Rebate ('MDR') program as noninnovator multiple source (N) drugs."  Exhibit A at 1 (emphasis in the original).  The Decision both marked the consummation of CMS's decision-making process and had legal consequences by determining (1) how Fresenius Kabi must report its drugs, and (2) the rebates that Fresenius Kabi must pay for them.

21.     Although Fresenius Kabi subsequently asked CMS on October 29, 2024 to rescind its decision in the hope of avoiding litigation, that request did not render the Decision non-final.  *First*, Fresenius Kabi specifically noted that in the absence of rescission, Fresenius Kabi would proceed with litigation.  *Second*, the APA provides that an action remains final regardless of whether the regulated entity has sought "any form of reconsideration" unless (a) reconsideration is required "by rule"; (b) the agency "provides that the action meanwhile is inoperative"; and (c) the agency provides an avenue for "appeal to superior agency authority."  5 U.S.C. § 704.  None of those conditions exists here.

22.     Fresenius Kabi has standing to bring this lawsuit because it has been harmed by CMS's refusal to classify the four heparin premixed bags as non-innovator multiple source drugs.  *See STI Pharma, LLC v. Azar*, 613 F. Supp. 3d 152 (D.D.C. 2020) ("The parties agree that STI Pharma has standing to sue…."); *see also, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379–80 (D.C. Cir. 2021); *Airlines for Am. v. TSA*, 780 F.3d 409, 410–11 (D.C. Cir. 2015).  That harm includes liability for increased rebates for the heparin products misclassified as innovator drugs.  If Fresenius Kabi prevails, CMS

will allow Fresenius Kabi to treat the four products at issue as non-innovator drugs, and that would allow Fresenius Kabi to realize the benefit of lower rebate amounts, thereby "creat[ing] 'a significant increase in the likelihood that [it] would obtain relief that directly redresses the injury suffered.'" *STI Pharma*, 613 F. Supp. 3d at 163 (quoting *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 739 (D.C. Cir. 2008)).

## STATUTORY AND REGULATORY BACKGROUND

### A.    Generic Drug Approval

23.    The original Federal Food, Drug and Cosmetic Act ("FDCA"), ch. 675, 52 Stat. 1040 (1938), prohibited interstate distribution of a "new drug" unless an NDA was "effective" for "such drug." *Id.* § 505(a), 52 Stat. at 1052. Under the original statute, an NDA became effective, automatically, on the sixtieth day after filing, unless FDA took affirmative action to block the application. *See id.* § 505(c)-(d), 52 Stat. at 1052.

24.    Once an NDA was in effect for a pioneer drug, other manufacturers could launch "me too" or "generic" versions without any sort of FDA application. *See* Statement of Dr. Marion Finkel, Director, Bureau of Drugs, FDA, Docket No. 79-P-0484/PSA, ¶ 32 (Dec. 1, 1980) ("Finkel Statement"); *see also* 40 Fed. Reg. 26142, 26143 (June 20, 1975).

25.    In 1962, Congress enacted the Kefauver-Harris Drug Amendments of 1962. Pub. L. No. 87-781, § 102, 76 Stat. 780, 781 ("1962 Amendments"). Under the 1962 Amendments (and still today), a new drug cannot be introduced unless an NDA for that drug has been affirmatively approved by FDA. *See* 21 U.S.C. § 355(a). Such approval requires a finding that the sponsor has demonstrated through substantial evidence (defined as one or more adequate and well-controlled clinical trials by qualified experts) that the drug will be safe and effective for the uses claimed in its labeling. *See id.* § 355(c), (d).

26.    The 1962 Amendments included transitional provisions addressing NDAs that had taken effect without FDA's approval.  Those NDAs were "deemed … approved" and their sponsors were given two years to submit substantial evidence of their efficacy.  Pub. L. No. 87-781, § 107(c)(2), 76 Stat. at 788.  After that time, FDA was directed to withdraw any NDA lacking substantial evidence of efficacy.  *See id.* § 107(c)(3)(B).

27.    To accomplish this transition, FDA partnered with the National Academy of Sciences/National Research Council to review the claims made for thousands of drug substances covered by deemed approved NDAs.  *See* 31 Fed. Reg. 9426 (July 9, 1966).  That effort was known as the Drug Efficacy Study Implementation ("DESI") program.

28.    If a DESI review found that a drug substance was effective, FDA would announce that finding in the Federal Register and specify the indications, labeling, and other conditions of approval for the drug substance. *See, e.g.*, 35 Fed. Reg. 16608 (Oct. 24, 1970) (announcement for heparin).  That announcement applied to *both* the pioneer product covered by the deemed approved NDA *and* any unapproved generic products.  *See* 21 C.F.R. § 310.6(a).  The pioneer sponsor was required to respond by filing a supplement showing compliance with the announcement, while manufacturers of generics were required to submit new applications showing the same.  *See, e.g.*, 35 Fed. Reg. at 16609 (instructions for heparin).

29.    The *form* of the application that generic manufacturers were required to submit varied by drug substance.  For some drug substances, FDA would accept "abbreviated NDAs." *See* 35 Fed. Reg. 6574 (Apr. 24, 1970).  But for other substances, abbreviated applications were not accepted, and generic manufacturers were required to file NDAs.  The difference usually turned on whether FDA believed that bioavailability data specific to each unique product was necessary—

if bioavailability could be presumed, an abbreviated NDA was appropriate. *See* 35 Fed. Reg. 11273 (July 14, 1970). If not, an NDA was required. *See id.*

30.     FDA's practice was to specify which form of application was required in the DESI announcement for a given drug substance. Heparin, for instance, is a naturally derived glycosaminoglycan extracted from pig intestines. Manufacturing heparin is, therefore, more complex, and its bioavailability more of a concern, than for many simpler drug substances. Accordingly, in the DESI announcement for heparin, FDA specified that generic manufacturers must submit NDAs. *See* 35 Fed. Reg. at 16609.

31.     Generic drug approval was substantially amended by the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman Amendments"). Under the Hatch-Waxman Amendments, there are now four available approval pathways for new drugs (other than biological products).

32.     The first pathway is an NDA under Section 505(b)(1). *See* 21 U.S.C. § 355(b)(1). These applications require the applicant to conduct (or obtain a right to reference to) ***all*** of the studies contained in the application to show that the drug is safe and effective. Many "innovator" or "pioneer" drugs are approved pursuant to Section 505(b)(1).

33.     The second pathway applies if the application relies on evidence of safety or efficacy ***other than*** studies conducted by the applicant (or to which the applicant has a right of reference). That other evidence can include published literature or FDA's previous approval of another drug (a "listed drug"). This second pathway is subject to additional requirements set out in section 505(b)(2) of the FDCA (mainly patent certification requirements that exist to protect the intellectual property of the sponsor of the listed drug) and is commonly called a "505(b)(2)

application." *See* 21 U.S.C. § 355(b)(2).  Both pioneer drugs and generic drugs can be approved pursuant to 505(b)(2) applications.

34.     The third pathway is an abbreviated new drug application ("ANDA"), which does not require a direct showing that the proposed drug is safe and effective.  Instead, an ANDA must show that the proposed drug is ***the same as*** a "reference listed drug" ("RLD") in terms of active ingredient, dosage form, strength, route of administration, labeling, quality, performance characteristics, and intended use.  *See* 21 U.S.C. § 355(j)(2)(A)(i)-(v).  That showing allows FDA to conclude that the proposed drug is equivalent to the RLD and, on that basis, ***infer*** that the proposed drug will be safe and effective.

35.     The fourth pathway is called a "petitioned ANDA."  This pathway allows a sponsor to submit an ANDA for a proposed drug that is not identical to the RLD in one or more characteristics.  FDA's permission must be obtained in advance pursuant to a suitability petition (hence the name).  *See* 21 U.S.C. § 355(j)(2)(C).  Permissible changes include changes in active ingredient, route of administration, dosage form, or strength, *id.*, but must not be so significant as to require new safety or efficacy studies, *see id.* § 355(j)(2)(i).

36.     Since the Hatch-Waxman Amendments, most generic drugs have been approved pursuant to ANDAs or petitioned ANDAs.  Nevertheless, there remain many situations in which FDA's approval for a generic drug may (or must) be obtained through an NDA rather than an ANDA.  A number of those are relevant here.

37.     First, the Hatch-Waxman Amendments did not cause FDA to revisit any prior generic drug approvals, meaning that any generics approved prior to 1984 remain approved today pursuant to generic NDAs.  The heparin sodium injection products marketed by Fresenius Kabi

are an example of this.  As discussed in more detail below, NDA 017029 was approved in 1972 following the DESI announcement for heparin.

38.    Second, large-volume parenteral drugs marketed in plastic containers are often approved pursuant to NDAs.  Because plastic presents additional safety concerns for injectable drugs (e.g., complex organic compounds could "leach" from the plastic container into the liquid to be injected), FDA long ago established a special rule holding that large-volume parenteral drugs in plastic containers require an approved NDA.  *See* 43 Fed. Reg. 58557, 58562 (Dec. 15, 1978).  A version of that rule remains in place today.  *See* 21 C.F.R. §§ 310.502(a)(10), 310.509(a).  This rule applies to the four heparin products at issue here because "large-volume parenteral drug in a plastic container" is just a technical name for a "premixed bag."

39.    Third, when a sponsor already holds an NDA and wants to introduce a new formulation of its generic drug, FDA usually prefers for the sponsor to file a supplement to that NDA rather than file a new application.  *See, e.g.*, 39 Fed. Reg. 39487, 39487 (Nov. 7, 1974) (disfavoring "the confusing aspect of applicants holding two approved applications for the same drug product"); FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees*, 4 (Dec. 2004) (different strengths, containers, and configurations "should be considered one application" if "intended for the same route of administration"); *see also* 21 C.F.R. § 314.101(d)(8)(i) (FDA may refuse to file a new ANDA if the same applicant already holds an approved NDA for the same drug); FDA, *Manual of Policies and Procedures: Applications for Parenteral Products in Plastic Immediate Containers*, MAPP 6020.2 Rev. 1, at 2 (Dec. 19, 2023) (approval for a parenteral drug in a plastic container can be obtained through "a supplement to a previously approved application").  That policy applies here because Fresenius Kabi and its predecessors have held an NDA for generic heparin since 1972.

12

Accordingly, when Fresenius Kabi introduced its premixed heparin bags, it consulted with FDA, and FDA agreed that Fresenius Kabi could obtain approval for its premixed heparin bags through a supplement to that NDA.

40.     Fourth, an ANDA can only be filed when FDA has designated an appropriate RLD. *See, e.g.*, 21 C.F.R. § 314.94(a)(3).  Although FDA had previously approved premixed heparin bags through NDAs submitted in the 1980s and 1990s, it did not identify any of those approved drugs as an RLD until decades later.  Thus, when Fresenius Kabi first approached FDA about introducing its premixed heparin bags in 2012, none of the approved NDAs for premixed heparin bags was yet identified as an RLD.  That technical circumstance was among the reasons why FDA agreed that Fresenius Kabi should submit a supplement rather than a new ANDA.

## B.     National Drug Codes

41.     In addition to being approved by FDA, a prescription drug marketed in the United States is supposed to be *listed* with FDA when its manufacturer registers as a drug establishment. *See* 21 U.S.C. § 360(i)-(j); *see also* 21 C.F.R., Parts 201 and 207.

42.     Drugs are listed with FDA by a numerical code known as a national drug code ("NDC"). *See, e.g.*, 21 C.F.R. §§ 201.2, 201.25(c), 201.57(c)(17), 207.33.  In its standard form, an NDC is 11 digits long, the first five of which are the "labeler code," which identifies the manufacturer.  The next four digits are the "product code," which identifies a unique combination of drug substance, strength, and dosage form.  The final two digits are the "package code," which identifies the container. *See* 65 Fed. Reg. 50312, 50329 (Aug. 17, 2000).

43.     Because drugs are generally marketed in more than one presentation, most approved applications reflect FDA's approval for multiple NDCs.

C.    The Medicaid Drug Rebate Program ("MDRP")

44.    Congress created the MDRP through the Omnibus Reconciliation Act of 1990, Pub.

L. No. 101-508, § 4401(a)(3), 104 Stat. 1388, 1388-143 (1990). Congress did so "to offset

Medicaid costs incurred by the federal government and the states for outpatient drugs provided to

Medicaid recipients." *Council on Radionuclides & Radiopharmaceuticals, Inc. v. Azar*, No. 18-

633 (RBW), 2019 WL 5960142, at *2 (D.D.C. Nov. 13, 2019); *see Astra USA, Inc. v. Santa Clara

Cnty.*, 563 U.S. 110, 114 (2011).

45.    Section 1927 of the MDRP statute provides that drug manufacturers must enter into

rebate agreements with HHS, 42 U.S.C. § 1396r-8(a)(1), and agree to pay rebates to the states to

receive state Medicaid payments for "each dosage form and strength of" covered outpatient drugs,

*id.* § 1396r-8(c)(1)(A), (c)(3)(A).

46.    The MDRP statute therefore assumes that each "covered outpatient drug" may

contain various "dosage form[s] and strength[s]," *i.e.* NDCs. It then requires that manufacturers

pay rebates NDC by NDC.

47.    The MDRP statute establishes rebate rates for three different categories of covered

outpatient drugs: (1) single source, (2) innovator multiple source, and (3) non-innovator multiple

source. *See* 42 U.S.C. § 1396r-8(c)(1), (3); *id.* § 1396r-8(k)(7)(A).

48.    The MDRP statute requires drug manufacturers to pay a higher rebate rate to states

for covered outpatient drugs falling into the first and second categories (single source and

innovator multiple source) than for those falling into the third category (non-innovator multiple

source). *Compare* 42 U.S.C. § 1396r-8(c)(1) & (2) *with id.* § 1396r-8(c)(3); *see also* Medicaid

Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5196 (Feb. 1, 2016) ("The statute requires

a different rebate formula for single source and innovator multiple source drugs, which results in higher rebates owed for those drugs than for noninnovator multiple source drugs.").

49. Drug manufacturers are required to self-report to CMS regarding the proper classification of the covered outpatient drugs that they market. *See* 42 U.S.C. § 1396r-8(b)(3).

50. Prior to April 18, 2019, Congress defined a "single source drug" as "a covered outpatient drug[,] ... which is produced or distributed under ***an original*** new drug application approved by the Food and Drug Administration[.]"  42 U.S.C. § 1396r-8(k)(7)(A)(iv) (2012) (emphasis added).

51. Congress defined a "multiple source drug" as "a covered outpatient drug … for which there [is] at least 1 other drug product which—(I) is rated as therapeutically equivalent … (II) … is pharmaceutically equivalent and bioequivalent … and (III) is sold or marketed in the United States during the period." *Id*. § 1396r-8(k)(7)(A)(i).

52. Congress defined an "innovator multiple source" drug as "a multiple source drug that was ***originally*** marketed under an ***original new drug application*** approved by the Food and Drug Administration." *Id*. § 1396r-8(k)(7)(A)(ii) (emphases added).

53. Finally, Congress defined a "noninnovator multiple source" drug as "a multiple source drug that is not an innovator multiple source drug." *Id*. § 1396r-8(k)(7)(A)(iii).

54. In this lawsuit, there is no disagreement that the heparin drugs at issue are "multiple source" (rather than single source); the only disagreement is whether the four heparin bags at issue should be classified as "innovator" multiple source drugs.

55. In 2019, Congress changed the definition of "innovator multiple source drug" by striking the words "originally" and "original."  As a result, the definition of an innovator multiple source drug now reads: "a multiple source drug that is marketed under a new drug application

approved by the Food & Drug Administration, unless the Secretary determines that a narrow exception applies (as described in section 447.502 of title 42, Code of Federal Regulations (or any successor regulation))."  Medicaid Services Investment and Accountability Act of 2019, Pub. L. No. 116-16, § 6(c), 133 Stat. 852, 863.

56.    Although the MDRP statute states that the "narrow exception" is "described in section 447.502" of the CMS regulations, section 447.502 does not describe, define, or explain the narrow exception at all.

### D.    CMS's Interpretation of the MDRP

57.    In 1995, the Health Care Financing Administration ("HCFA"), CMS's predecessor agency, published a proposed rule to implement the MDRP.  HCFA acknowledged that no relevant statute "define[s] the term 'original NDA,'" as that term was, at that time, used in the definitions of "single source" and "innovator multiple source" drugs.  *See* Medicaid Program; Payment for Covered Outpatient Drugs Under Drug Rebate Agreements with Manufacturers, 60 Fed. Reg. 48442, 48453 (Sept. 19, 1995) (proposed rule).

58.    HCFA proposed to "interpret [the term] to comport with [the agency's] understanding of the intent of the Congress" and, thus, to mean an "FDA-approved drug or biological application that received one or more forms of patent protection ... or marketing exclusivity rights granted by the FDA."  *Id*.  In other words, HCFA proposed to ensure that only pioneer drugs must pay higher rebates.

59.    HCFA's notice of proposed rulemaking explained the two-tiered system of rebates reflected in Section 1927.  HCFA first noted that the statute "requires larger rebates for single source and innovator multiple source drugs," and therefore concluded that "the term 'original NDA' was included in [§§] 1927(k)(7)(A)(ii) and (iv) of the Act for the purposes of extracting

larger rebates from those products that received some form of patent or marketing protection for a specific period of time ... than [from] noninnovators that produce generic drugs with no market protection." *Id.* ("We believe the term 'original NDA,' as proposed above, produces this effect.").

60.    The proposed rule also would have defined a "noninnovator multiple source" drug to include "[a]ll products approved under an abbreviated new drug application, [or a] paper new drug application under the FDA's former 'Paper NDA' policy, or an application under section 505(b)(2) of the [FDCA]." *Id.* at 48482.

61.    These proposed definitions remained pending until 2007, when CMS published a final rule that addressed the definition of an "innovator multiple source" drug.  The 2007 rule mirrored the statutory language in defining the term "innovator multiple source drug" to mean "a multiple source drug that was originally marketed under an original [NDA.]"  Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39142, 39240 (July 17, 2007).  The 2007 rule also defined "noninnovator multiple source drug" to include drugs "marketed under an [ANDA]" and drugs "that entered the market before 1962 [and were] not originally marketed under an original NDA." *Id.* at 39240.

62.    Unlike the 1995 proposal, the 2007 rule (i) no longer included products that were approved pursuant to paper NDAs or 505(b)(2) applications in the definition of "noninnovator multiple source drug," and (ii) did not include a definition of "original NDA."  Instead, CMS took the position that the word "original" was a nullity, such that every "NDA" should be considered an "original NDA." *See id*. at 39163.  CMS stated:  "We do not see the need to add a definition of NDA in this final rule.  Further, the FDA does not make a distinction between an NDA and an original NDA; therefore, we view these terms as having the same meaning." *Id*.

63.     In February 2012, CMS published a proposed rule in which it acknowledged that "questions have arisen regarding whether an 'original NDA' is the same as an NDA and whether the drug category may be different if a drug is approved under an NDA."  Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5323 (Feb. 2, 2012).

64.     CMS reiterated its position that every NDA is an original NDA.  *See id.*  ("[A]n original NDA is equivalent to an NDA filed by the manufacturer for approval under section 505 of the [FDCA] for purposes of approval by the FDA for safety and effectiveness").  CMS proposed to delete the word "original" from its regulatory definition, notwithstanding that "original" was in the definition adopted by Congress.  *See id*. at 5323 ("[W]e are also proposing to use the term 'NDA' when addressing such application types for brand name drugs and ***not use the term 'original NDA'*** when referring to such drugs[.]") (emphasis added); *see also id.* at 5359-61.

65.     CMS finalized the current regulation in February 2016.  *See* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5190 (Feb. 1, 2016).  CMS summarized comments that had taken issue with its stated intention to read "original NDA" as the equivalent of "NDA." Those commenters had reasoned that "CMS has no authority to read out any word from the statute[,]" especially when the term "'original new drug application' is unique to section 1927(k)(7)(A)," and is used "to clarify the distinction Congress made between innovator and generic drugs."  *Id*. at 5190-91.  Commenters also explained that if Congress had wanted to simply distinguish between ANDAs and NDAs, it "would have used only those terms, like [it] did elsewhere."  *Id*. at 5191.  Other commenters highlighted the agency's decision to equate "original NDA" and "NDA" was irrational because it ignored "the circumstances surrounding the approval" and "the changing history of FDA's approval process."  *Id*. at 5190-91.  Commenters further

showed that CMS had no reasonable basis to force "manufacturers of certain 'generics' [to] pay higher rebates only because they were approved under an NDA." *Id*. at 5191.

66.     In response, CMS reiterated its position that "'original NDA' is designed typically to mean an NDA (including an NDA filed under [§] 505(b)(1) or (2) of the [FDCA])." *Id*.

67.     At the same time, however, CMS acknowledged what it called "narrow exceptions" to its position that every NDA should be considered an "original NDA."

> There may be very limited circumstances where, for the purposes of the [MDRP], **certain drugs might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator** multiple source drug.  For example, certain parenteral drugs in plastic immediate containers, for which FDA required that an NDA be filed, might be more appropriately treated, for purposes of the MDR program, as if they are marketed under an ANDA and classified as a noninnovator multiple source drug.  Likewise, certain drugs approved under a paper NDA prior to the enactment of the Hatch-Waxman Amendments of 1984 or under certain types of literature-based 505(b)(2) NDA approvals after the Hatch-Waxman Amendments of 1984 might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug, **depending on the unique facts and circumstances of the particular situation.**

*Id*. (emphases added).

68.     CMS stated that it would issue "guidance on the scope of these very limited circumstances in the future."  *Id*.  CMS emphasized that "the narrow exception will not be considered applicable to drugs marketed under NDAs that were not approved under either the paper NDA process prior to 1984 or under certain types of literature-based 505(b)(2) approvals, or for drugs that received patent protection or statutory exclusivity."  *Id*.

69.     On May 2, 2016, CMS circulated a Medicaid Rebate Program Notice for Participating Drug Manufacturers (Release No. 98), which addressed the "narrow exceptions" in in 42 C.F.R. § 447.502.  Release No. 98 stated that the narrow exception provision was designed "to ensure that drugs that are or were required to be marketed under an original new drug application for technical reasons" would not be erroneously classified as innovators.

70.    Release No. 98 identified three "examples of drugs with NDA approvals which might be more appropriately treated as if they were approved under an ANDA and classified as noninnovator multiple source drugs." The examples were the same ones identified in the preamble to the final rule: (1) injectable drugs in plastic containers for which FDA required an NDA; (2) drugs approved under paper NDAs prior to 1984; and (3) drugs approved pursuant to literature-based 505(b)(2) applications. Release No. 98 also stated that a narrow exception would not be granted to any drug that "received patent protection or statutory exclusivity."

71.    Release No. 98 stated that the narrow exception analysis would apply to the "NDA at issue" and not "the active ingredient in the drug." Release No. 98 identified several categories of information that CMS believed would be relevant to its analysis, including (i) FDA materials related to the NDA; (ii) information about patent protection or market exclusivity; (iii) information about any listed drug on which the NDA may have relied; and (iv) information about other relevant drugs, including any therapeutic equivalents.

72.    To date, CMS has not defined the narrow exception in any regulation. Instead, its official guidance on the subject comes in the form of (1) CMS's response to commenters in its 2016 rulemaking, offering nonspecific, non-exhaustive illustrative examples, and (2) Release No. 98, sub-regulatory guidance to manufacturers, sharing the same examples. CMS has stated that, under the narrow exception, drugs should be classified as non-innovators if they were approved under an NDA "for technical reasons" and would "be more appropriately treated as if they were approved under an [ANDA]." Release No. 98 at 1.

73.    CMS does not publish its narrow exception decision letters, making precedent difficult to assess. However, in decision letters sent to Fresenius Kabi, CMS also has stated that a controlling consideration for a narrow exception is whether the drug that was approved pursuant

to the NDA was a duplicate of a previously approved drug.  *See, e.g.*, CMS Letter re Argatroban, at n.1 (May 15, 2023) ("a duplicate of a drug approved under an NDA ... would be classified as a noninnovator" but "drugs which are not such duplicates ... should be classified as either a single source drug or innovator multiple source drug").

74.    CMS also has stated that an important consideration is whether a similar application could today be filed as an ANDA.  *See, e.g.*, CMS Letter re Lidocaine, at 4 n.1 (Jan. 19, 2023) (a drug approved under an NDA is "more appropriately treated as a noninnovator" "ONLY if it would now be approved under section 505(j)," i.e. the ANDA approval pathway).

### FACTUAL BACKGROUND

75.    Heparin is one of the oldest injectable drugs still in clinical use.  The first NDA (NDA 552) for the pioneer version of heparin, known as Liquaemin®, took effect at the end of the Great Depression in 1939.  *See* FDA, *Drugs@FDA,* https://bit.ly/47DgHXG (last visited Dec. 10, 2024) ("Drugs@FDA") (search term: heparin sodium) (listing NDA 000552 as the first and lowest numbered result under "Heparin Sodium").  By the end of World War II, the market for heparin injections had become saturated, including heparin products marketed under NDAs 3895, 4570, 5264, and 5521.  *See id.*

76.    Heparin is primarily used in medicine as an anticoagulant.  One of the most well-established uses of heparin is as an intravenous infusion during and after surgery to prevent the formation of blood clots.  Administering an infusion of heparin generally involves drawing concentrated heparin from a vial and admixing it into a large-volume container (historically glass bottles, but today plastic bags) of a standard intravenous fluid (e.g., saline, or dextrose) and allowing the admixture to slowly and continuously "drip" through a plastic tube ending in a cannula that has been inserted into the patient's vein.

77.    Administering heparin as an infusion was one of the drug's intended uses from the very beginning.  The inaugural edition of the *Physician's Desk Reference* in 1947 contained the following instructions:

> ADMINISTRATION AND DOSAGE: Heparin sodium is intended for intravenous injection by the intravenous drip method or by single interrupted injections. For continuous intravenous injection 10 to 20 cc of heparin solution are added to one liter of 5% glucose or saline and the resultant solution allowed to flow into the vein at a rate of 20 to 25 drops per minute.

78.    Because NDA 552 and the others took effect prior to 1962, heparin sodium injection was included in the DESI program.  In 1970, FDA announced that heparin sodium injection was effective to prevent clots caused by surgery. *See* 35 Fed. Reg. at 16608.  FDA directed that any person "who distributes or intends to distribute" a then-unapproved heparin product "should submit a new drug application." *Id*. at 16609.

79.    At the time of the DESI announcement, Fresenius Kabi's predecessor (Invenex) was one of the firms marketing generic heparin without any sort of drug application.  In response to the DESI announcement, Invenex submitted NDA 17029 in April 1971.

80.    The labeling for NDA 17029 was based on a sample package insert that FDA subsequently provided to Invenex in November 1971.  As approved by FDA in February 1972, the labeling for Invenex's products included dosing instructions for "intravenous infusion" and recommended "20,000 to 40,000 units/day in 1,000 mL of solution."  Pursuant to that approval, Invenex marketed heparin in glass vials of various sizes intending for their contents to be drawn out and admixed into large-volume containers of saline or dextrose and administered to patients through intravenous infusion.

81.    In 1977, FDA issued a revised DESI announcement with new, mandatory labeling for all heparin products. *See* 42 Fed. Reg. 54623 (Oct. 7, 1977).  The mandatory labeling contained the following instructions for heparin infusions:

| Method of administration | Frequency | Recommended dose (based on 150-lb (68 kg) patient) |
|---|---|---|
| Deep subcutaneous (intrafat) injection | Initial dose | 5,000 units by intravenous injection followed by 10,000–20,000 units of a concentrated solution, subcutaneously. |
| Intermittent intravenous injection | Every 8 hr. Or every 12 hr. | 8,000–10,000 units of a concentrated solution. 15,000–20,000 units of a concentrated solution. |
|  | Initial dose | 10,000 units either undiluted or in 50–100 ml isotonic sodium chloride injection. |
|  | Every 4 to 6 hr. | 5,000–10,000 units, either undiluted or in 50–100 ml isotonic sodium chloride injection. |
| Intravenous infusion | Initial dose | 5,000 units by intravenous injection. |
|  | Continuous | 20,000–40,000 units in 1,000 ml of isotonic sodium chloride solution for infusion per day. |

*Id.* at 54624 (emphasis added).

82.    FDA issued further labeling revisions in 1983, which described the infusion use of heparin in detail.  *See* 48 Fed. Reg. 50167, 50168 (Oct. 31, 1983) ("When heparin is added to an infusion solution for continuous intravenous administration, the container should be inverted at least 6 times to insure adequate mixing and prevent pooling of the heparin in the solution.").  The 1983 labeling also acknowledged that heparin infusions of 20,000 to 40,000 units could be prepared using "any compatible solution."  *Id.*

83.    Around the same time, other companies began to develop premixed heparin bags for the United States market.  Between 1982 and 1992, FDA approved the following *ten* applications for premixed heparin bags:

***NDAs for heparin in premixed bags***

| Application | Sponsor | Approval | Amount/diluent |
|---|---|---|---|
| NDA 18609 | Baxter | 1982 | 1,000 to 20,000 units in 0.9% saline |
| NDA 18814 | Baxter | 1983 | 20,000 units in 5% dextrose |
| NDA 18916 | Abbott | 1984 | 5,000 to 25,000 units in 0.45% saline<br>5,000 to 25,000 units in 0.9% saline |
| NDA 19130 | Braun | 1984 | 1,000 to 5,000 units in 5% dextrose |

| NDA 18911 | Abbott | 1985 | 5,000 to 10,000 in 0.45% saline<br>10,000 to 25,000 units in 0.9% saline<br>10,000 to 25,000 units in 5% dextrose |
| NDA 19042 | Braun | 1985 | 1,000 to 5,000 units in 0.9% saline |
| NDA 19134 | Braun | 1985 | 25,000 units in 5% dextrose |
| NDA 19135 | Braun | 1985 | 25,000 units in 0.9% saline |
| NDA 19339 | Abbott | 1985 | 10,000 to 25,000 units in 5% dextrose |
| NDA 19953 | Braun | 1992 | 1,000 to 2,000 units in 0.9% saline |

As highlighted above, NDA 18916 (Abbott, 1984), NDA 18911 (Abbott, 1985), NDA 19314 (Braun, 1985), and NDA 19339 (Abbott, 1985) all obtained FDA's approval to market premixed bags containing the same strength of heparin (25,000 units) in the same solutions (0.45% saline and 5% dextrose) as the premixed bags that Fresenius Kabi launched decades later.

84.     In the early 2000s, Fresenius Kabi acquired the rights to an intravenous packaging material known as freeflex®. *See, e.g.*, U.S. Trademark Registration No. 3006971 (Oct. 18, 2005). In 2012, Fresenius Kabi sought guidance from FDA about the appropriate filing strategy to obtain permission to market heparin in freeflex bags. Referencing the NDAs identified above, Fresenius Kabi observed that none was listed as an RLD and proposed to file a supplement to NDA 17029. FDA agreed that a supplement was appropriate.

85.     Fresenius Kabi submitted Supplement 138 to NDA 17029 in December 2015 seeking approval of six formulations of heparin in freeflex plastic bags. The supplement relied on FDA's prior approval of other premixed heparin bags, including NDA 19339 (heparin in 5% dextrose) and NDA 18916 (heparin in 0.45% sodium chloride). Because Fresenius Kabi sought approval for duplicates of well-established products, the supplement contained only module 1 (administrative information) and module 3 (manufacturing information). The supplement did not

contain any safety or efficacy information.  Nor did it claim any exclusivity, or list any patents, for the proposed heparin bags.

86.     The supplement was initially denied over a labeling issue, and Fresenius Kabi resubmitted the supplement in February 2017.  The 2017 resubmission continued to rely on FDA's prior approval of NDA 18916 and NDA 19339.

87.     In August 2017, FDA approved Supplement 138 to NDA 17029, which authorized Fresenius Kabi to launch the four premixed heparin bags at issue in this action.  As approved in 2017, their indications and infusion instructions remain materially unchanged from the labeling that FDA established in 1983.

88.     In May 2018, Fresenius Kabi filed Supplement 141 to NDA 17029 for a prefilled syringe containing heparin to be manufactured at a new site and marketed with new labeling.  FDA approved the prefilled syringe in November 2018.

## PROCEDURAL BACKGROUND

89.     When CMS issued Release No. 98 in May 2016, it indicated that initial requests for narrow exceptions would be due in March 2017.

90.     On November 22, 2016, Fresenius Kabi submitted a request to CMS asking the agency to categorize a number of its generic drugs, including heparin, as non-innovator drugs under the MDRP ("2016 Request").  The four premixed bags of heparin and the prefilled heparin syringe were not addressed in the 2016 Request as they were not yet approved.

91.     On January 23, 2020, having received no substantive response to the 2016 Request, Fresenius Kabi submitted a revised request to CMS ("2020 Request").  The next day, CMS asked Fresenius Kabi to identify the "11-digit NDCs" of each generic drug for which Fresenius Kabi was "requesting the narrow exception" as well as a copy of "the original FDA approval letter" for each

such generic drug.  Fresenius Kabi provided the requested information and letters to CMS on February 22, 2020.

92.    On February 24, 2020, CMS responded that Fresenius Kabi identified five NDCs for heparin products (the four premixed bags and the prefilled syringe) that were not listed in the 2016 Request.  On March 3, 2020, Fresenius Kabi explained that the NDCs were launched subsequent to the 2016 Request and asked that CMS consider those NDCs along with all of the other heparin products marketed under NDA 17029.

93.    On March 8, 2020, CMS responded that it was "unable" to do so and required Fresenius Kabi to submit a supplemental narrow exception request.

94.    On April 29, 2020, CMS requested additional "documentation that supports your NDA (017029) … was approved based on the DESI Heparin findings." On May 29, 2020, Fresenius Kabi provided CMS additional materials including a complete copy of NDA 17029 for sodium heparin injection.

95.    On January 4, 2021, CMS sent two letters informing Fresenius Kabi of its decision that nine heparin vials marketed under NDA 17029 were properly classified as non-innovators and could pay lower, non-innovator rebates ("January 2021 Decisions").

96.    On June 11, 2021, Fresenius Kabi asked CMS to confirm that the January 2021 Decisions also applied to the four premixed heparin bags and the prefilled syringe that were also marketed under NDA 17029.  In the alternative, Fresenius Kabi also submitted a new request covering just those five presentations.

97.    On July 26, 2021, CMS requested additional information regarding those five products, including "information about the differences, if any, between the heparin NDCs that

were granted a narrow exception and these new heparin NDCs."  Fresenius Kabi responded on September 30, 2021, identifying the different formulations.

98.     On November 9, 2021, CMS requested the supplemental approval letters from FDA for the premixed heparin bags and the prefilled syringe, as well as "patent/exclusivity information" for them.  Fresenius Kabi provided the requested FDA letters on December 16, 2021, and further explained that none of the five presentations of heparin received any form of exclusivity or was protected by any sort of patent.

99.     When over two years had passed without any word from CMS, Fresenius Kabi informed CMS on January 3, 2024 that it would consider the outstanding requests for heparin denied if CMS did not send a final response by March 4, 2024.

100.    On February 27, 2024, CMS sent a letter informing Fresenius Kabi of its decision that a heparin vial marketed under NDA 17651 was properly classified as a non-innovator and could pay lower, non-innovator rebates ("February 2024 Decision").

101.    On March 11, 2024, CMS sent a letter informing Fresenius Kabi of its decision that the prefilled heparin syringe marketed under NDA 17029 was properly classified as a non-innovator and could pay lower, non-innovator rebates ("March 2024 Decision").

102.    On March 21, 2024, Fresenius Kabi objected to CMS's continuing delay in issuing a decision with respect to the four premixed heparin bags.

103.    On May 24, 2024, Fresenius Kabi requested a meeting with CMS to discuss the status of, among other things, the proper classification of the four premixed heparin bags.  CMS did not grant the requested meeting.

104.    Finally, on September 30, 2024, CMS sent a letter informing Fresenius Kabi of its decision that four premixed heparin bags must be classified as innovator drugs and must pay rebates at the higher rate for innovator drugs.  Exhibit A.

105.    CMS acknowledged that Fresenius Kabi markets the four premixed heparin bags at issue under the same NDA as the heparin vials and prefilled syringe for which CMS "previously granted a narrow exception," but asserted that classifications are not "applied at the NDA level," and further claimed that the "determination as to whether a narrow exception applies requires a separate analysis of each NDC under a given NDA." *Id.* at 3.

106.    The balance of CMS's reasoning was unclear.  At one point, CMS asserted that a narrow exception can only be obtained when a drug "required a new NDA approval because it was an older, unapproved drug and FDA required the manufacturer to obtain approval through the DESI process." *Id.*  CMS claimed that the only way the premixed heparin bags could qualify "based on this reasoning" would be with "evidence that *the NDAs* submitted for the products were submitted due to the DESI notice." *Id.*  (emphasis added).  But Fresenius Kabi provided CMS evidence confirming that "the NDA" for these products was NDA 17029, which was submitted in 1971 in direct response to the DESI announcement for heparin in 1970. *See* ¶ 79, *supra.*

107.    CMS also stated there was no "evidence that this particular strength of Heparin Sodium in Sodium Chloride or Heparin Sodium in Dextrose was previously marketed prior to the enactment of the Hatch-Waxman Amendments." *Id.* at 3-4.  CMS further stated that "this strength" (*i.e.*, 25,000 units of heparin) and these solutions (saline and dextrose) were not "part of the DESI review" and "thus the [narrow] exception does not apply."   Exhibit A at 4.  None of those statements is accurate.  In 1970, the DESI review specifically approved the administration of heparin as an infusion to prevent blood clots during and after surgery. *See* ¶ 78, *supra.*  The

mandatory labeling that FDA required for *all* heparin products in 1971, in 1977, and again in 1983 specifically recommended infusion of "20,000-40,000 units" per day (a range that includes the 25,000 units at issue here) admixed in any compatible intravenous solution. *See* ¶ 81, *supra*. Premixed bags of heparin in that range (including bags of 25,000 units) were approved by FDA and marketed by other companies prior to the Hatch-Waxman Amendments. *See* ¶ 83, *supra*. And those bags contained the same strength of heparin mixed in the same standard intravenous solutions (0.45% saline and 5% dextrose) used by Fresenius Kabi. *See* ¶ 83, *supra*.

108.    CMS also claimed that the four premixed heparin bags are not "appropriately treated" as non-innovator drugs because "the 505(j) approval pathway was available" when Fresenius Kabi sought FDA's approval for them. Exhibit A at 4. That too is wrong because CMS's assertion ignores (1) FDA policy preferring the submission of supplements to existing applications rather than new applications; (2) FDA agreed with Fresenius Kabi that a supplement was the correct mechanism to obtain approval; and (3) the 505(j) pathway was not available because FDA had not yet identified an RLD for premixed heparin bags. *See* ¶ 84, *supra*.

109.    In a footnote, CMS conceded that its guidance had promised that narrow exceptions would be granted to "parenteral drugs in plastic immediate containers, for which FDA required that an NDA be filed." Exhibit A at 4 n.1. CMS denied that this guidance applied to the premixed heparin bags marketed by Fresenius Kabi by arguing that this guidance was limited to "circumstances where a drug is the same formulation of an existing drug." *Id.* Again, CMS is mistaken because the freeflex bags launched by Fresenius Kabi in 2017 are duplicates of bags introduced by Abbott, Baxter, and Braun in the 1980s. *See* ¶¶ 83, 85-86, *supra*.

110.    In its five decisions, CMS reached the following conclusions:

| NDA | Product | Container | mL | Units / mL | Strength (units) | FDA Approval | CMS Classification (Decision) |
|---|---|---|---|---|---|---|---|
| 17029 | 0540-13 | Multi-dose vial | 1 | 1,000 | 1,000 | 1972 | Non-innovator (January 2021, 1) |
| 17029 | 0540-15 | Multi-dose vial | 10 | 1,000 | 10,000 | 1972 | Non-innovator (January 2021, 1) |
| 17029 | 0540-36 | Multi-dose vial | 30 | 1,000 | 30,000 | 1972 | Non-innovator (January 2021, 1) |
| 17029 | 0542-13 | Multi-dose vial | 1 | 10,000 | 10,000 | 1972 | Non-innovator (January 2021, 1) |
| 17029 | 0542-14 | Multi-dose vial | 5 | 10,000 | 50,000 | 1972 | Non-innovator (January 2021, 1) |
| 17029 | 0915-13 | Multi-dose vial | 1 | 20,000 | 20,000 | 1972 | Non-innovator (January 2021, 1) |
| 17029 | 0262-06 | Multi-dose vial | 1 | 5,000 | 5,000 | 1972 | Non-innovator (January 2021, 1) |
| 17651 | 0047-10 | Multi-dose vial | 10 | 5,000 | 50,000 | 1978 | Non-innovator (February 2024) |
| 17029 | 0276-02 | Single-dose vial | 2 | 1,000 | 2,000 | 1986 | Non-innovator (January 2021, 1) |
| 17029 | 0543-13 | Single-dose vial | 0.5 | 10,000 | 5,000 | 2010 | Non-innovator (January 2021, 2) |
| 17029 | 0517-74 | Premixed bag 0.45% saline | 250 | 100 | 25,000 | 2017 | **Innovator** (September 2024) |
| 17029 | 0518-77 | Premixed bag 0.45% saline | 500 | 50 | 25,000 | 2017 | **Innovator** (September 2024) |
| 17029 | 0522-77 | Premixed bag 5% dextrose | 500 | 50 | 25,000 | 2017 | **Innovator** (September 2024) |
| 17029 | 0523-74 | Premixed bag 5% dextrose | 250 | 100 | 25,000 | 2017 | **Innovator** (September 2024) |
| 17029 | 0118-01 | Prefilled syringe | 0.5 | 10,000 | 5,000 | 2018 | Non-innovator (March 2024) |

## COUNT I

**Defendants' Refusal to Classify The Four Fresenius Kabi Drugs at Issue As Non-innovator Multiple Source Drugs Is Not In Accordance With Law.**

111.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

112.    CMS's refusal to classify the four premixed heparin bags at issue as non-innovator multiple source drugs is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

113.    The APA allows a person suffering a wrong or adversely affected by an agency action to receive judicial review of the agency's action.  5 U.S.C. § 702.  The APA provides that a reviewing court shall hold unlawful and set aside agency action that is "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

114.    The four premixed heparin bags at issue are not innovator drugs.  Heparin has been a multiple-source generic drug for generations.  The original NDA for heparin took effect in 1939, and generic versions of heparin have been on the market since the early 1940s.  The four premixed heparin bags at issue here, which were approved by FDA in 2017, are duplicates of premixed heparin bags introduced by other companies and approved by FDA in the 1980s.  More broadly, they involve the same active ingredient, the same dosage form, and the same route of administration as heparin drugs marketed since the Great Depression.  None of these drugs qualifies as an innovator under the MDRP.

115.    The plain language of the MDRP statute at all times has defined innovator classifications at the NDA level.  All of the heparin products marketed by Fresenius Kabi—

including the four premixed heparin bags at issue here—are, and always have been, follow-on drugs under NDA 17029.

116.    CMS itself has determined that drugs under NDA 17029 are non-innovator drugs in multiple decisions previously issued to Fresenius Kabi.  CMS has no legal authority to classify the four heparin bags at issue in this lawsuit any differently than the heparin vials or the heparin prefilled syringe marketed under that same NDA.  CMS's contrary decision is in excess of statutory authority and not in accordance with law.  5 U.S.C. § 706(2)(A), (C).

117.    When FDA approved the four premixed heparin bags at issue here in 2017, the MDRP defined an innovator drug as one "originally marketed" under an "original new drug application" approved by FDA.  *See* 42 U.S.C. § 1396r-8(k)(7)(A)(ii) (2012 version).  NDA 17029 is not an "original" NDA.  *STI Pharma*, 613 F. Supp. at 167.  Rather, NDA 17029 was an application for a follow-on, generic duplicate of a long-established drug.  As a result, the four premixed heparin bags at issue were not originally marketed under an original new drug application.  Rather, they all are follow-on, generic versions of an innovator drug developed many decades ago.

118.    Likewise, under the current version of the MDRP, the four premixed heparin bags at issue remain non-innovator drugs subject to the lower MDRP rebate percentage obligation. Under the MDRP, drugs subject to the "narrow exception" also are properly categorized as non-innovator drugs.  42 U.S.C. § 1396r-8(k)(7)(A)(ii).  CMS has concluded that "duplicates" of drugs previously approved by FDA are properly categorized as non-innovators under the "narrow exception."

119.    Here, the four premixed heparin bags at issue are materially the same as other heparin drugs that CMS has categorized as non-innovator drugs.  The fact that these four products

are packaged in a flexible plastic bag rather than in a vial or a syringe does not render them innovator drugs. The four premixed heparin bags at issue here also are duplicates of drugs approved by FDA in the 1980s that contained the same strength of heparin, were also premixed in plastic intravenous bags, and contained the same standard intravenous solutions. The four premixed heparin bags at issue here also reflect the same indications, other conditions of use, active ingredient, route of administration, dosage form, and strength as heparin products approved by FDA decades ago through the DESI program.

120.   In sum, the four premixed heparin bags approved by FDA in 2017 are not innovator drugs, but instead are follow-on duplicates of long-established drugs. These drugs are properly treated as non-innovator drugs under the MDRP, and Defendants' refusal to treat these drugs as non-innovator drugs is contrary to the MDRP statute.

121.   Fresenius Kabi lacks an adequate remedy at law for Defendants' unlawful action.

## COUNT II

**Defendants' Refusal To Classify The Fresenius Kabi's Drugs At Issue as Non-innovator Multiple Source Drugs Is Arbitrary and Capricious.**

122.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

123.   CMS's denial of non-innovator status to the four premixed heparin bags at issue is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

124.   The APA allows a person suffering a wrong or adversely affected by an agency action to receive judicial review of the agency's action. *Id.* § 702. "When assessing an arbitrary and capricious claim, [courts] consider whether the agency's decision was reasonable and reasonably explained." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (internal quotation marks omitted).

125.    Under the APA, agency action is arbitrary and capricious when the agency acts counter to the evidence in the record or when its action lacks a rational connection to the facts of the record.  *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983); *Haselwander v. McHugh*, 774 F.3d 990, 998-999 (D.C. Cir. 2014).   Further "[a]gency action is arbitrary and capricious if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sinclair Wyoming Refin. Co. LLC v. EPA*, 114 F.4th 693, 711 (D.C. Cir. 2024) (internal quotation marks omitted).   Additionally, "an agency's unexplained departure from precedent is arbitrary and capricious." *ABM Onsite Servs.—West, Inc. v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017).

126.    CMS's decision is arbitrary and capricious because it fails to follow CMS's guidance in Manufacturer Release No. 98 and CMS's practice of granting narrow exceptions under circumstances such as the ones presented here.  *See Sinclair Wyoming Refin.*, 114 F.4th at 711 ("[A]n agency 'may not ... depart from a prior policy *sub silentio*'"); *ABM Onsite Servs.—West*, 849 F.3d at 1142..

127.    Under Manufacturer Release No. 98, the four premixed heparin bags qualify under the "narrow exception" because they are generic drugs that were approved under an NDA "for technical reasons."  *See* Release No. 98, at 1.  Fresenius Kabi's predecessor was required to file NDA 17029 in 1971 because (i) the statutory ANDA pathway ushered in by the Hatch-Waxman Amendments in 1984 did not yet exist, and (ii) FDA required an NDA in its DESI notice for heparin due to issues over the bioavailability of a naturally derived drug.  Fresenius Kabi filed a supplement to that NDA for the four premixed heparin bags at issue here in 2015 because (i) FDA

rules disfavor filing multiple applications for the same active drug in the same dosage form and route of administration; (ii) FDA agreed that a supplement was the appropriate filing mechanism; and (iii) FDA had not yet identified an RLD for premixed heparin bags when Fresenius Kabi first sought approval.

128.    None of these circumstances supports treating the four premixed heparin bags as innovator drugs. None provides a basis for concluding that the four premixed heparin bags here are somehow innovator products rather than follow-on generic versions of a drug that has been on the market for generations. Rather, all of these circumstances reflect purely "technical reasons" for filing an NDA in 1971 and a supplement in 2015 and thus, under Release No. 98, do not transform these heparin products into pioneer drugs.

129.    CMS also has concluded that the narrow exception is appropriate where a drug is a duplicate of a previously approved drug. *See, e.g.*, CMS Letter re Argatroban, at n.1 (May 15, 2023) ("a duplicate of a drug approved under an NDA … would be classified as a noninnovator.") Fresenius Kabi's four premixed heparin bags are generic duplicates of other premixed heparin bags first approved by FDA in the 1980s. They contain the same strength of heparin mixed in plastic intravenous bags containing the same fluids. Accordingly, they appropriately should be classified as non-innovator drugs.

130.    CMS also has highlighted that an important consideration is whether a similar application could today be filed as an ANDA. *See, e.g.*, CMS Letter re Lidocaine, at 4 n.1 (Jan. 19, 2023) (a drug approved under an NDA is "more appropriately treated as a noninnovator" "ONLY if it would now be approved under section 505(j)"). FDA agreed in 2012 that these four heparin products should be reviewed through a supplement in part because no RLD had yet been identified for heparin bags. Nevertheless, and much like an ANDA, the supplement relied on

FDA's prior approval of NDA 19339 (1985) and NDA 18916 (1984). Subsequently, FDA identified one of those products as an RLD drug (NDA 18916) for premixed heparin bags. That action has enabled ANDAs for other heparin NDCs to be filed, which Fresenius Kabi did successfully in 2018 for two other premixed heparin bags in lower strengths and in 0.9% saline. *See* Cover Letter to ANDA 212441 (Dec. 17, 2018); FDA Approval Letter for ANDA 212441 (July 24, 2020). Thus, the four premixed heparin bags at issue here would today be submitted for approval through an ANDA, and that likewise warrants grant of the narrow exception here.

131.    CMS assertion that the "narrow exception" was unavailable because these heparin products were a "new strength and formulation" and were "not part of the DESI review" likewise is arbitrary and capricious. *Id.* at 4. First, CMS's statements are wrong. As reflected in FDA Federal Register notices from 1970, 1977 and 1983, intravenous infusions of heparin at this strength and in these fluids undeniably were part of the DESI review. *See* ¶¶ 78, 81-82, *supra*.

132.    Second, the government's sources (including the NDC Directory, the Orange Book, and Drugs@FDA) all reflect that FDA approved, in 1984 and 1985, the same strength (25,000 units of heparin) in the same intravenous fluids (0.45% saline and 5% dextrose), which confirms that Fresenius Kabi's products were approved as duplicates of preexisting drugs.

133.    Third, CMS's "new strength and formulation" argument finds no support in Manufacturer Release No. 98. Indeed, "formulation" refers comprehensively to all characteristics of a finished drug product, including dosage forms, strengths, routes of administration and inactive ingredients. *See* 21 C.F.R. § 314.70(b)(2)(i). "Formulation" is broader than "duplicate." *See* 54 Fed. Reg. 28872, 2877 (July 10, 1989); *see also* FDA, Draft Guidance for Industry: Applications Covered by Section 505(b)(2) (Dec. 1999) (duplicates need not contain the same inactive ingredients). Thus, while generic drugs are usually (but not always, especially when a petitioned

ANDA is filed) *duplicates* of their RLD, they usually are not the same *formulation* because they differ in some way (e.g., different inactive ingredients are the norm). Under CMS's "same formulation" requirement, the "narrow exception" would be rendered a null set because generic drugs normally are different formulations than their RLD.

134.    Fourth, CMS cannot create new criteria to deny relief that is warranted under its existing standards. *Fontem U.S., LLC v. FDA*, 82 F.4th 1207, 1222 (D.C. Cir. 2023) ("Shifting the regulatory goalposts without explanation is arbitrary and capricious"). In any event, the new criteria advanced by CMS are satisfied here because the government's sources reflect that FDA approved, in 1984 and 1985, the same specific strength (25,000 units of heparin) in the same intravenous fluids (0.45% saline and 5% dextrose).

135.    Finally, DESI review is not required to qualify under the narrow exception. Release No. 98 does not limit the narrow exception to drugs that were subject to DESI review. To the contrary, it explains, for example, that a narrow exception can be granted for "drugs approved under a paper NDA prior to the enactment of the Hatch-Waxman Amendments of 1984," and "drugs approved under certain types of literature-based 505(b)(2) NDA approvals after the Hatch-Waxman Amendments of 1984." Release No. 98 at 2. CMS cannot impose new requirements on an ad hoc basis. *See Fontem*, 82 F.4th at 1222; *Farrell v. Blinken*, 4 F.4th 124, 138 (D.C. Cir. 2021) (explaining that "haphazard and shape-shifting administrative requirements [are] the very definition of arbitrary and capricious agency action").

136.    In failing to classify the Fresenius Kabi drugs as non-innovator drugs, CMS took final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

137.    Fresenius Kabi lacks an adequate remedy at law for Defendants' unlawful action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Declare that CMS's refusal to classify the four premixed heparin bags marketed under Fresenius Kabi's heparin NDA 17029 is arbitrary, capricious, and not in accordance with the law or otherwise in excess of the Agency's authority under the MDRP;

B.      Declare that the four premixed heparin bags marketed under Fresenius Kabi's heparin NDA 17029 qualify as non-innovator multiple source drugs under the MDRP;

C.      Vacate and set aside CMS's refusal to classify the four premixed heparin bags marketed under Fresenius Kabi's heparin NDA 17029 as non-innovator multiple source drugs;

D.      Remand the matter to CMS to classify the four premixed heparin bags marketed under Fresenius Kabi's heparin NDA 17029 as non-innovator multiple source drugs; and

E.      Grant such other relief as this Court deems just and proper.

February 7, 2025                              Respectfully Submitted,

Sean C. Griffin (No. 442284)
sgriffin@sidley.com
(Tel.) 202-736-8107
Paul J. Zidlicky (No. 450196)
pzidlicky@sidley.com
(Tel.) 202-736-8013
Brooke E. Boyd (No. 1721284)
brooke.boyd@sidley.com
(Tel.) 202-736-8529
Kevin A. Sforza (No. 90003884)
ksforza@sidley.com
(Tel.) 202-736-8413
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

Trevor L. Wear (*pro hac vice* forthcoming)
twear@sidley.com
(Tel.) 312-853-7101
Rina Mady (*pro hac vice* forthcoming)
rmady@sidley.com
(Tel.) 312-853-6109
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
(312) 853-7036 (fax)

*Counsel for Plaintiff Fresenius Kabi USA, LLC*